UNITED STATES DISTRICT COURT
EASTERN DIVISION OF TENNESSEE
KNOXVILLE DIVISION

| | | |
|---|---|---|
| C.H., a minor under the age of eighteen (18), through parents and natural guardians, L.M. and A.H., and L.M. and A.H., individually, and all other similarly situated Persons,<br><br>      Plaintiffs,<br><br>vs.<br><br>TENNESSEE DEPARTMENT OF EDUCATION, through its designated agent, Commissioner of Education, DR. PENNY SCHWINN;<br><br>and<br><br>TENNESSEE STATE BOARD OF EDUCATION, through its designated agent, Executive Director, DR. SARA HEYBURN MORRISON;<br><br>and<br><br>U.S. DEPARTMENT OF EDUCATION, through its designated agent, Secretary of Education, DR. MIGUEL CARDONA;<br><br>      Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | CLASS ACTION<br><br>JURY DEMAND |

**CLASS ACTION COMPLAINT**

The adult Plaintiffs, L.M. and A.H., and their minor child, C.H., hereinafter sometimes

referred to collectively as the Plaintiffs, bring this action, by and through counsel, on behalf of

their own minor child, C.H., as well as all other student Class Members similarly situated who

are able to attend public schools within the State of Tennessee, for their Complaint against

Defendants, alleging the following based upon personal knowledge and their own acts, and

information and belief as to all other matters, based upon information, knowledge, and

1

investigation conducted by and through their attorneys, and hereby allege that student Class Members with a disability in the State of Tennessee are not being afforded certain rights prescribed to them pursuant to the Americans with Disabilities Act (ADA), Individuals with Disabilities Education Act (IDEA), and relevant rulings set forth by the United States Supreme Court. The Plaintiffs believe that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for extensive discovery. Accordingly, the Plaintiffs submit as follows:

## **INTRODUCTION**

1. Adult Plaintiffs, L.M. and A.H., are the biological parents of minor child C.H., who was diagnosed at birth with refractory epilepsy with a slight malformation of the right brain.

2. At age one (1), C.H. had a hemispherectomy on the right brain, which removed the right side of the brain. All things being considered, the procedure was a success.

3. Since having the hemispherectomy procedure, C.H. has continued to suffer certain medical and physical conditions including, but not limited to, development delay, left hemiplegia status, post-right hemispherectomy issues related to the child's seizure disorder, the necessity of wearing prism glasses, the necessity of wearing an ankle brace for mobility, and a borderline IQ level.

4. C.H. is very social with grade appropriate friends, enjoys school, and has an infectious smile.

5. C.H.'s third grade Tennessee Comprehensive Assessment Program (TCAP) scores indicated below basic performance and below grade-level performance scorings.

6. Further, C.H.'s TCAP scores in the fifth grade continued to show below basic performance and below grade-level scorings.

7.     Going into C.H.'s 9th grade year, in 2022, their Individual Education Plan (IEP) was drafted by the school and reviewed by parents L.M. and A.H. Unsure if the draft IEP was sufficient for their child, parents hired legal counsel.

8.     For informational purposes, student's progress and skill level is measured by two (2) separate assessments, the easyCBM assessment and the i-Ready assessment. The easyCBM assessment consists of standardized measures that sample from a year's worth of curriculum to assess the degree which students have mastered the skills and knowledge deemed critical at each grade level. The i-Ready assessment is an adaptive assessment that adjusts its questions to suit the student via online testing which consists of a stepladder sequence of questions starting at kindergarten level questions advancing through the 12th grade level. The assessment is designed to determine the grade level efficiency of each student regardless of the grade they are currently in.

9.     Upon reviewing the draft IEP, C.H.'s results for the easyCBM and i-Ready testing that was conducted in preparation for their 9th grade IEP is as follows:

    a.     Basic Reading Skills: C.H. was identified as lacking the ability to: decode CVC words, identify long and short vowels, identify story elements, make inferences, and determine word meaning. C.H. had an easyCBM assessment ranking of eighth grade level and had an i-Ready assessment of first grade level.

    b.     Mathematics: C.H. was identified as struggling with basic mathematical problems, such as addition and subtraction, and the ability to do multi-step problems. C.H. had an easyCBM

assessment of eighth grade level and had an i-Ready assessment rating of second grade level.

    c.      Reading Comprehension: C.H. was identified as having difficulty reading fluently, had not acquired fundamental decoding skills, had not acquired fundamental vocabulary skills, had not acquired word knowledge skills, and was reading at 19 words per minute. C.H. had an easyCBM assessment of eighth grade level and an i-Ready assessment of first grade level.

10.    As part of C.H.'s 9th grade IEP, their gross motor skills and fine motor skills were scrutinized pursuant to the ADA. More specifically, C.H. was identified as having the following deficiencies with gross motor skills, including, but not limited to, the following: "muscle weakness with asymmetry; left arm disregard; required assistance with stairs and unlevel surface." Further, C.H. was identified as having deficiencies with fine motor skills, including, but not limited to, the following: "the requirement of ongoing occupational therapy due to limited use of the child's left hand and physical delays in the child's right hand."

11.    Simply put, C.H. was unable to read, write, or complete basic math problems, but was advanced to the 10th grade. C.H. wanted to read. C.H. wanted to write clearly. C.H. wanted to compute basic math. C.H.'s parents believed that they could obtain those goals.

12.    Moreover, as part of C.H.'s 9th grade IEP, their transitional plan, which is a plan for students fourteen (14) and up related to post-secondary plans and preparing that child, C.H. was identified with having a post-secondary plan of owning a coffee shop.

13.    Furthermore, C.H.'s 9th grade IEP accommodations listed, which Plaintiffs L.M. and A.H. are of the information and belief were copied and pasted from previous IEP reports and

not uniquely tailored to the needs of C.H. based on the same exact language, included

accommodations, including, but not limited to, the following: the requirement for photocopies of

other peer notes from class; adult transcriptions (which C.H. never received); text to speech

accommodations; preferential seating to accommodate C.H.'s diagnosis; extended time in

breaks; the ability to record teacher lectures which was recommended and acquired through

C.H.'s attorney; and, physical and occupational therapies.

14.     It is noted that the 2022 IEP was a draft form through which the Plaintiffs'

attorney reviewed. Ultimately, it was determined by parents, child, and legal counsel that private

school placement was to be obtained to close the gap in C.H.'s education.

15.     After approximately one (1) year of private school enrollment, C.H. has made

significant academic progress and success in relation to closing the gap in grade level standards.

More specifically, C.H. has advanced their ability to read, computes basic math, and writes in

cursive. C.H. believes these skills will help prepare them for post-secondary life and is excited to

see how much they can progress before graduation.

## **THE PARTIES**

16.     The adult Plaintiffs, L.M. and A.H., and their minor child, C.H., who has attended

a public school system their entire life except for one (1) year of private school enrollment as

referenced above, all being residents of the State of Tennessee, bring this action, by and through

counsel, on behalf of themselves, their own minor child, C.H., as well as all other student Class

Members similarly situated who are able to attend public schools within the State of Tennessee.

17.     Defendant Tennessee Department of Education is an entity required and created

pursuant to Tennessee Code Annotated 49-1-201, and can be served with process via its

designated agent, Commissioner of Education, Dr. Penny Schwinn, at 710 James Robertson Parkway, Nashville, Tennessee 37243.

18.     Defendant Tennessee State Board of Education is an entity required and created pursuant to Tennessee Code Annotated 49-1-301, and can be served with process via its designated agent, Executive Director, Dr. Sara Heyburn Morrison, at 500 James Robertson Parkway, 5th Floor, Davy Crockett Tower, Nashville, Tennessee 37243.

19.     Defendant Dr. Miguel Cardona is the United States Secretary of Education and is responsible for the operation of the United States Department of Education, which is an executive agency of the United States Federal Government. Mr. Cardona is being sued in his official capacity as the United States Secretary of Education, and can be served with process at the U.S. Department of Education, 400 Maryland Avenue, SW, Washington, District of Columbia 20202.

## JURISDICTION AND VENUE

20.     This Honorable Court has federal question jurisdiction under 28 U.S.C. § 1331 because this case concerns whether Defendants have acted in compliance with the ADA, the IDEA, and applicable United States Supreme Court case law as more fully described herein.

21.     This Honorable Court has jurisdiction under 28 U.S.C. § 1346, et al., as this case involves a claim against an agency of the federal government.

22.     This Honorable Court has jurisdiction under 28 U.S.C. § 1361, et al., because jurisdiction exists in any case "to compel an officer or employee of the United States or any agency thereof to perform a duty owed to the Plaintiff."

6

23. This Honorable Court has jurisdiction under 28 U.S.C. § 1343, et al., because jurisdiction exists "to recover damages or to secure equitable or other relief under any act of congress providing for the protection of civil rights."

24. Venue is proper with this Honorable Court under 28 U.S.C. § 1391(b)(3), because Defendants are government entities, events that give rise to this action are across all three districts, and the Defendants are subject to this court's personal jurisdiction.

## **ALLEGATIONS**

25. The Plaintiffs seek to bring this class action against the Defendants on behalf of special needs students with one (1) or more disabilities in the State of Tennessee, under Federal Rule of Civil Procedure 23, upon their requests for monetary relief, damages and injunctive and declaratory relief. This action satisfies the numerosity, commonality, typicality, adequacy, predominance, superiority, and ascertainability requirements of those provisions.

26. The Plaintiffs seek to certify the following class: Any student with an identified eligible disability who are being or were damaged by the alleged acts, or failures to act, of the Defendants, who received, is receiving, should have received, or will receive a free and appropriate public education (FAPE) within any and all public school systems located in the State of Tennessee from the time period beginning on August 14, 2004, when the current IDEA went into effect. The Plaintiffs reserve the right to revise the class definition based upon information discovered after the filing of this action.

27. The Plaintiffs proposed class meets the prerequisites of Rule 23 (a) as follows:

    (1)    Numerosity: This class is so numerous that joinder of all members is impractical. The Plaintiffs estimate that the class consists of tens of thousands of students. Membership in this class is readily ascertainable

7

from a public record search of all public schools named as Defendants, and statistics concerning students with special needs maintained at the state and federal level.

(2)     Commonality: There are numerous questions of law or fact common to the class, and those issues predominate over any question affecting only individual class members. The common legal and factual issues include, but are not limited to, the following: whether the Defendants' conduct described herein violates the ADA; whether Defendants' conduct described herein violates the IDEA Improvement Act; whether the Defendants' conduct described herein violates the rulings set forth by the United States Supreme Court; and, whether the class members are entitled to damages and monetary relief, as well as declaratory and injunctive relief.

(3)     Typicality: The claims asserted by class representatives through the Plaintiffs are typical of the claims of the class, in that the Plaintiffs and/or their child is or was a student with a disability in the State of Tennessee and has not been afforded certain rights, protections, and privileges afforded to them under the ADA, IDEA Improvement Act, and applicable holdings of the United States Supreme Court as more fully described herein. Further, each member of the proposed class has been similarly injured by the Defendants' misconduct.

(4)     Adequacy: The class representative Plaintiffs will fairly and adequately protect the interests of the class. The class representative Plaintiffs have

8

retained attorneys experienced in complex litigation and applicable law related to special needs students in the State of Tennessee. The Plaintiffs and their counsel will vigorously prosecute this litigation. Neither the Plaintiffs nor their counsel have interest that conflict with the interests of other class members. Accordingly, the Plaintiffs' proposed class meets the requirements of certification under Rule 23(b)(3) in that:

(a)    Predominance of commons questions: The questions of law or fact common to the class, as identified above, predominate over any questions affecting only individual members, because the common question is the systemic lack of special education staff, funding, technology, resources, software, and facilities to provide FAPE for students with disabilities receiving special education services pursuant to IDEA within the State of Tennessee's public school system.

(b)    Superiority: The class representative Plaintiffs and class members have all suffered damages as a result of Defendants' wrongful conduct. A class action is superior to other available methods for the fair and efficient adjudication of the controversy. Treatment as a class action will permit a large number of similarly situated persons to adjudicate their common claims in a single forum simultaneously, efficiently, and without the duplication of effort and expense that numerous individual actions would engender. Class treatment will also permit the adjudication of claims by

9

many members of the proposed class who could not individually afford to litigate a claim such as is asserted herein. Additionally, a class action is superior because the class is comprised of many individuals who are low income and are geographically dispersed. Moreover, this class action likely presents no difficulties in management that would preclude maintenance as a class action.

(c)     Ascertainability: Membership in the class also meets the implied ascertainability requirement that the class members can be readily identified based on the class definition in that it is sufficiently definite so that it is administratively feasible for the Court to determine whether a particular individual is a member of the proposed class, because  eligible class members are students that have had, have, or will continue receiving special education services pursuant to IDEA within the State of Tennessee's public school system from 2006 to present.

## APPLICABLE LAW

**I.     Federal Law – Individuals with Disabilities Education Act**

28.     On May 17, 1954, the United States Supreme Court, in the landmark case of *Brown v. Bd. of Educ.*, 344 U.S. 1 (1952), determined that it was unconstitutional for state educational institutions to segregate children by race. Ultimately, this decision became the foundational ruling upon which the IDEA was created.

29.     Approximately ten (10) years after the United States Supreme Court issued the decision in *Brown*, the federal congress enacted the Elementary and Secondary Education Act

10

(ESEA), 89 P.L. 10, 79 Stat. 27 (1965), which was signed into law on April 9, 1965, as a part of President Lyndon Johnson's "war on poverty" which called for equal access to education for **ALL** students and provided federal funding for both primary and secondary education for students who are disadvantaged by poverty.

30.     However, it was not until October 8, 1971, that the federal courts began to recognize the individual rights of students with disabilities when the U.S. District Court for the Eastern District of Pennsylvania required that students with disabilities were to be placed in publicly funded school settings that met their individual and educational needs based upon a proper and thorough evaluation. *Pa. Asso. for Retarded Children v. Pennsylvania*, 334 F. Supp. 1257 (E.D. Pa. 1971).

31.     On August 1, 1972, the United States District Court for the District of Columbia held that students classified as "exceptional" made it unlawful for public schools to deny educational opportunities to "exceptional" students, including those with mental and learning disabilities and learning behavioral issues. *Mills v. Bd. of Educ., 348 F. Supp. 866 (1972).*

32.     As a result of those two (2) federal district court rulings, a congressional investigation took place in 1972 in which the United States Congress set out, for the first time, to determine exactly how many children with special education needs were being underserved. The Bureau of Education for the Handicapped ultimately determined there were Eight Million (8,000,000) children eligible to receive special education services, and of that total, less than half of those students were having their educational needs met, Two Million Five Hundred Thousand (2,500,000) of those students were receiving a substandard education, and One Million Seven Hundred and Fifty Thousand (1,750,000) of these students were not even in school. Gail Ensher,

Burton Blatt, James Winschel *Head Start for the Handicapped: Congressional Mandate Audit* (Jan. 1977, https://library.syracuse.edu/digital/guides_sua/pdf/blatt_036.pdf).

33.     Although students with disabilities were recognized as a protected class upon the creation of the Civil Rights Act, it was not until November 29, 1975 that President Gerald Ford signed the Education for All Handicapped Children Act, 94 P.L. 142, 89 Stat. 773 (1975), which required that states who chose to accept money from the federal government be required to provide equal access to education for children with disabilities.

34.     Over ten (10) years passed until President Ronald Reagan signed the Handicapped Children's Protection Act, 99 P.L. 372, 100 Stat. 796 (1986), which gave parents of children with disabilities the right to participate in the creation of their child's individual education plan.

35.     Shortly thereafter, on January 1, 1990, Congress enacted Public Law 101-476 which focused on ensuring that students would transition smoothly into life after school by including it in the child's IEP. This set the stage for the enactment of the IDEA on June 4, 1990, which provides **ALL** students access to the same curriculum

36.     Fourteen (14) years later, on December 3, 2004, Congress amended the IDEA to increase the accountability and overall success of students with disabilities. Individuals with Disabilities Education Improvement Act of 2004, 108 P.L. 446, 108 Stat. 446 (2004).

37. Pursuant to the United States Department of Education, "[t]he stated purpose of the IDEA is:

    a.  to ensure that all children with disabilities have available to them a free appropriate public education that emphasizes special education and related services designed to meet their unique needs and prepare them for further education, employment, and independent living;

12

b. to ensure that the rights of children with disabilities and parents of such children are protected;

c. to assist States, localities, educational service agencies, and Federal agencies to provide for the education of all children with disabilities;

d. to assist States in the implementation of a statewide, comprehensive, coordinated, multidisciplinary, interagency system of early intervention services for infants and toddlers with disabilities and their families;

e. to ensure that educators and parents have the necessary tools to improve educational results for children with disabilities by supporting system improvement activities; coordinated research and personnel preparation; coordinated technical assistance, dissemination, and support; and technology development and media services;

f. to assess, and ensure the effectiveness of, efforts to educate children with disabilities." U.S. Dep't of Education, U.S. Department of Education's Individuals with Disabilities Education Act (IDEA)- About IDEA (2023), https://sites.ed.gov/idea/about-idea/.

II. **Federal Regulations - Title 34 of the Code of Federal Regulations, Chapter III "Office of Special Education and Rehabilitative Services, Department of Education."**

38. The Office of Special Education and Rehabilitative Services ("OSERS") operates within The United States Department of Education. Pursuant to OSERS's website, "The Office of Special Education Programs (OSEP) is dedicated to improving results for infants, toddlers, children and youth with disabilities ages birth through 21 by providing leadership and financial support to assist states and local districts." U.S. Dep't of Education, Office of Special Education

and Rehabilitative Services- About (2023),

https://www2.ed.gov/about/offices/list/osers/osep/index.html.

39.     Title 34 of the Code of Federal Regulations Subpart B is the regulations of the

Offices of the Department of Education and Chapter III of Subpart B is the regulations of

OSERS.

40. "The purposes of this part are—

> (a) To ensure that all children with disabilities have available to them a
> free appropriate public education that emphasizes special education and
> related services designed to meet their unique needs and prepare them for
> further education, employment, and independent living;
>
> (b) To ensure that the rights of children with disabilities and their parents
> are protected;
>
> (c) To assist States, localities, educational service agencies, and Federal
> agencies to provide for the education of all children with disabilities; and
>
> (d) To assess and ensure the effectiveness of efforts to educate children
> with disabilities. (Authority: 20 U.S.C. 1400(d))" 34 C.F.R. § 300.1
> (2023).

41.     34 C.F.R. Chapter III cover regulations, including but not limited to, directives for

terms of art, state eligibility of funding, free and appropriate education (FAPE) requirements,

least restrictive environment (LRE) requirements, private schools, state education agency (SEA)

responsibilities, local education agency (LEA) eligibility and responsibilities, procedures, and

monitoring and enforcement.

### III.     State Code- Title 49 "Education", Chapter 10 "Special Education"

42. The legislative intent for Chapter 10 of Title 49 was codified in the Tennessee Code Annotated as 49-10-101, as follows:

"(a)

    i. (1) It is the policy of this state to provide, and to require school districts to provide, as an integral part of free public education, special education services sufficient to meet the needs and maximize the capabilities of children with disabilities.

    ii. (2) The **timely** implementation of this policy to the end that all children with disabilities actually receive the special education services necessary to their proper development is declared to be an **integral** part of the policy of this state.

(b) This section applies to all children with disabilities regardless of the schools, institutions or programs by which those children are served.

(c) The state board of education is authorized to adopt rules and regulations to effectuate this chapter. The rules must be promulgated in accordance with the Uniform Administrative Procedures Act, compiled in title 4, chapter 5." Tenn. Code Ann. § 49-10-101 (2019).

43. Tennessee has codified substantially similar language and requirements contained in both the IDEA and OSERS regulations.

44. The Tennessee Legislative has codified the following, including, but not limited to, definitions, LEA responsibilities, entitlement to FAPE, LRE, enforcing the IDEA, evaluation of students, funding, individual education plan (IEP), and procedural direction.

**IV.** **Rules of the State Board of Education- Chapter 0520-01-09 "Special Education Programs and Services"**

15

45.     The Tennessee State Board of Education "adopts by reference the Compilation of Federal regulations at 34 C.F.R. Part 300 in their entirety unless otherwise provided herein as the policies and procedures for administration of special education programs and services in the State." Tenn. Comp. R. & Regs. 0520-01-09-.01 (2021).

46.     Furthermore, the Tennessee Department of Education has created an instructional guide called "Special Education Framework", which includes an overview, IEP writing process, and implementing the IEP section.

### V.      Federal Case Law- The United States Supreme Court

47.     The Plaintiffs would argue that a recent series of three (3) United States Supreme Court decisions have set the stage for the filing of this class action. Specifically, in *Forest Grove School District v. T.A*., the United States Supreme Court held that the Amendments to the IDEA did not categorically bar reimbursement of private-education tuition if the child has not previously received special education related services through the public school, and that the IDEA authorized reimbursement of the cost of the child's private special education services. *Forest Grove School District v. T.A*., 557 U.S. 230 (2009)

48.     This case set the stage for *Endrew* in which the United States Supreme Court held that in order for a school district to meets its substantive obligation under the IDEA, it must offer an individual education plan that is reasonably calculated to enable the child to make progress in light of the child's circumstances.

49.     The United States Supreme Court's ruling in *Endrew* involved an action brought by the parents of a fourth grade child with autism who were of the belief their child's academic and functional progress had stalled primarily because the child's IEP was inadequate. *Endrew F. v. Douglas County School Dist. RE–1*, 137 S. Ct. 988 (2017). In substance, the Court held that a

16

school must offer an IEP reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances. *Id.*

50.    "The Individuals with Disabilities Education Act (IDEA or Act) offers States federal funds to assist in educating children with disabilities. 84 Stat. 175, as amended, 20 U.S.C. § 1400 *et seq.*; see *Arlington Central School Dist. Bd. of Ed. v. Murphy,* 548 U.S. 291, 295, 126 S.Ct. 2455, 165 L.Ed.2d 526 (2006). In exchange for the funds, a State pledges to comply with a number of statutory conditions. Among them, the State must provide a free appropriate public education—a FAPE, for short—to all eligible children. § 1412(a)(1)." *Id.*

51.    "A FAPE, as the Act defines it, includes both 'special education' and 'related services.' § 1401(9). 'Special education' is 'specially designed instruction ... to meet the unique needs of a child with a disability'; 'related services' are the support services 'required to assist a child ... to benefit from that instruction.' §§ 1401(26), (29). A State covered by the IDEA must provide a disabled child with such special education and related services 'in conformity with the [child's] individualized education program,' or IEP. § 1401(9)(D)." *Id.*

52.    "The IEP is 'the centerpiece of the statute's education delivery system for disabled children.' *Honig v. Doe,* 484 U.S. 305 (1988). A comprehensive plan prepared by a child's "IEP Team"), an IEP must be drafted in compliance with a detailed set of procedures. § 1414(d)(1)(B).These procedures emphasize collaboration among parents and educators and require careful consideration of the child's individual circumstances. § 1414. The IEP is the means by which special education and related services are 'tailored to the unique needs' of a particular child. *Rowley, 458 U.S., at 181*." *Id.*

53.     The IEP process requires school districts, teachers, therapists, administrators, parents, medical professionals, and advocates to work together as individuals like links in a chain to provide a free and appropriate public education for students with disabilities.

54.     IEPs are comprehensive documents that are based on performance data, medical opinions and testing, classroom observations, and concerted opinions of all parties involved.

55.     IEPs further outline the academic progress and goals of each individual student pursuant to statutory requirements.

56.     "The IDEA requires that every IEP include 'a statement of the child's present levels of academic achievement and functional performance,' describe 'how the child's disability affects the child's involvement and progress in the general education curriculum,' and set out 'measurable annual goals, including academic and functional goals,' along with a 'description of how the child's progress toward meeting' those goals will be gauged. §§ 1414(d)(1)(A)(i)(I)-(III). The IEP must also describe the 'special education and related services ... that will be provided' so that the child may 'advance appropriately toward attaining the annual goals' and, when possible, 'be involved in and make progress in the general education curriculum.' § 1414(d)(1)(A)(i)(IV)." *Id.*

57.     "To meet its substantive obligation under the IDEA, a school must offer an IEP reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances." *Id.* More plainly, the United States Supreme Court has defined this requirement as adequate rigor.

58.     "The IEP must aim to enable the child to make progress. After all, the essential function of an IEP is to set out a plan for pursuing academic and functional advancement. See §§ 1414(d)(1)(A)(i)(I)–(IV). This reflects the broad purpose of the IDEA, an 'ambitious' piece of

18

legislation enacted 'in response to Congress' perception that a majority of handicapped children in the United States 'were either totally excluded from schools or [were] sitting idly in regular classrooms awaiting the time when they were old enough to "drop out." ' " *Rowley,* 458 U.S., at 179, (quoting H.R.Rep. No. 94–332, p. 2 (1975)). A substantive standard not focused on student progress would do little to remedy the pervasive and tragic academic stagnation that prompted Congress to act." *Id.*

59. Congress designed the individual education plans to be uniquely created for each individual student. "A focus on the particular child is at the core of the IDEA. The instruction offered must be '*specially* designed' to meet a child's '*unique* needs' through an '[*i* ]*ndividualized* education program.' §§ 1401(29), (14) (emphasis added). An IEP is not a form document. It is constructed only after careful consideration of the child's present levels of achievement, disability, and potential for growth. §§ 1414(d)(1)(A)(i)(I)-(IV), (d)(3)(A)(i)-(iv)." *Id.*

60. "When all is said and done, a student offered an educational program providing 'merely more than *de minimis* progress from year to year can hardly be said to have been offered an education at all. For children with disabilities, receiving instruction that aims so low would be tantamount to 'sitting idly ... awaiting the time when they were old enough to 'drop out.'" *Rowley,* 458 U.S., at 179. The IDEA demands more. It requires an educational program reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances." *Id.*

61. "To provide the free appropriate public education (FAPE) required by the IDEA, a school does not have to provide a child with a disability opportunities to achieve academic

19

success, attain self-sufficiency, and contribute to society that are *substantially equal* [emphasis added] to the opportunities afforded children without disabilities." *Id.*

62.     The landmark ruling in *Endrew* was entrenched by the United States Supreme Court's holding in *Winkelman v. Parma City School District*, 127 S. Ct. 1994 (2007), whereby the Court essentially held that parents are entitled to prosecute IDEA claims.

63.     "It is beyond dispute that the relationship between a parent and child is sufficient to support a legally cognizable interest in the education of one's child; and, what is more, Congress has found that 'the education of children with disabilities can be made more effective by ... strengthening the role and responsibility of parents and ensuring that families of such children have meaningful opportunities to participate in the education of their children at school and at home.'" *Id.*

64.     More specifically, in *Endrew*, the Court held that for a child fully integrated in the regular classroom, an individual IEP is to be reasonably written to enable the child to achieve passing marks and advance from grade to grade. *Id.* Of particular note is that the Court in *Endrew* further held that if grade-level advancement is not a reasonable prospect for a child, the IEP need not aim for it, but the educational program that is created for the student must be appropriately ambitious and rigorous in light of the student circumstances, just as advancement from grade to grade is appropriately ambitious for students in the regular classroom. Individuals with Disabilities Act, § 614(d)(1)(A)(i)(I)-(IV). *Id.*

65.     The *Endrew* decision paved the way for the recent decision by the United States Supreme Court in *Perez*, which was entered on March 21, 2023.

66.    In *Perez*, the Petitioner, Miguel Luna Perez, was a deaf student who attended public schools in the State of Michigan from age nine (9) through age twenty (20) in the Sturgis Public School District. *Perez v. Sturgis Pub. Sch*., 2023 LEXIS 1291 (2023).

67.    When the school system informed Mr. Perez and his family that he would not be permitted to graduate, they filed an Administrative Complaint with the Michigan Department of Education alleging (among other things) that the school system did not provide Mr. Perez with FAPE as required by the IDEA, claiming that the services provided unto Mr. Perez were substandard, and that his educational progress had been misrepresented during each year's evaluation of progress given unto the Perez family during the annual IEP meeting. *Id.*

68.    Justice Gorsuch delivered the Opinion for the unanimous Court which held that Mr. Perez's interpretation of Section 1415 of the IDEA dealing with "remedies", better comports with the statute's terms, and allows for money damages, an injunction, or declaratory judgment, and that nothing in the IDEA shall be construed as restricting or limiting the availability of these remedies under the federal statutes like the ADA. *Id.*

69.    When schools fail to meet the standards set forth in the IDEA, they are in violation of the ADA, codified at 42 U.S.C. § 12101, et seq. The IDEA and ADA work together to provide students with disabilities a fair opportunity to receive a public education.

70.    The ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132.

71.    When schools fail to provide FAPE, they are denying students with disabilities the benefit of a public school education.

21

72.     "To state a claim under Title II of the ADA, a plaintiff must allege: (1) that he is a 'qualified individual with a disability;' (2) that he was 'excluded from participation in or ... denied the benefits of the services, programs, or activities of a public entity' or otherwise 'discriminated [against] by such entity;' (3) 'by reason of such disability.' *Shotz v. Cates*, 256 F.3d 1077 (11th Cir. 2001) (quoting 42 U.S.C. § 12132)." *Perez.*

73.     Pursuant to *Perez*, Plaintiffs and Class Members are entitled to compensatory damages for past denial of a free and appropriate education, because the IDEA does not provide such remedy. "A suit premised on past denial of free and appropriate education may nonetheless proceed without exhausting IDEA's administrative processes if the remedy a plaintiff seeks is not one IDEA provides." *Id.*

74.     As a result of the Defendants' actions, Plaintiffs and Class Members have suffered damages, including but not limited to, all damages as better described in the causes of action below.

## CAUSES OF ACTION

**I - The Defendants are in Violation of the IDEA: 20 U.S.C. 1400 et. seq.; Regulations of the Offices of the Department of Special Education: 34 C.F.R. Part 300 et. seq.; Special Education: Tenn. Code Ann. Title 49 Chapter 10; Rules of the State Board of Education: Chapter 0520-01-09; and Tennessee Department of Education Special Education Framework.**

75.     The Plaintiffs and Class Members repeat and reallege each and every allegation contained above as if fully set forth herein.

76.     The Plaintiffs and Class Members are of information and belief, and therefore aver, that the Defendants are in violation of 20 U.S.C 1400 et. seq., for not providing FAPE, among other services.

22

77.     The Plaintiffs and Class Members are of information and belief, and therefore aver, that the Defendants are in violation of Title 34 CFR Part 300 et. seq., for not providing FAPE, among other services.

78.     The Plaintiffs and Class Members are of information and belief, and therefore aver, that the Defendants are in violation of Chapter 10 of Title 49 of the Tennessee Code Annotate for not providing FAPE, among other services.

79.     The Plaintiffs are of information and belief, and therefore aver, that Defendants are in violation of Chapter 0520-01-09 of the Rules of the State Board of Education for not providing FAPE, among other services.

80.     The Plaintiffs are of information and belief, and therefore aver, that Defendants are in violation of Tennessee Department of Education, Special Education Framework, for not following the IEP guidelines set forth.

81.     As a result of Defendants' noncompliance with the aforementioned statutes, regulations, and policies, the Plaintiffs and Class Members are of information and belief, and therefore aver, that Defendants have failed to provide the Plaintiffs and Class Members the following services and opportunities, including, but not limited to: lack of the necessary number of special needs staff; lack of funding; lack of facilities dedicated to promote academic and social success; and, lack of learning resources, aids, and software geared to promote academic and social success.

82.     Further, as a result of Defendants' noncompliance with the aforementioned statutes, regulations, and policies, the Plaintiffs and Class Members are of information and belief, and therefore aver, they have suffered damages, including but not limited to, actual and compensatory damages, the lack of free and appropriate public education, the loss of future

23

earning capacity, the lack of fundamental knowledge, the lack of academic success, and the loss of the ability to attain an academic diploma.

### II - The Defendants are in Noncompliance with *Endrew*

83.     The Plaintiffs and Class Members repeat and reallege each and every allegation contained above as if fully set forth herein.

84.     The Plaintiffs and Class Members are of information and belief, and therefore aver, that the Defendants are in violation and noncompliance with the United States Supreme Court's holding in *Endrew*.

85.     As a result of the Defendants' noncompliance with the United States Supreme Court's holding in *Endrew*, the Plaintiffs and Class Members are of information and belief, and therefore aver, they have suffered damages, including but not limited to, the ability to achieve academic success through a uniquely tailored IEP specifically designed to meet each child's unique needs.

86.     Moreover, as a result of the Defendants' noncompliance with the United States Supreme Court's holdings in *Endrew*, the Plaintiffs and Class Members are of information and belief, and therefore aver, that Defendants have failed to provide the Plaintiffs and Class Members the following services and opportunities, including, but not limited to: lack of necessary number of special needs staff; lack of funding; lack of facilities dedicated to promote academic and social success; and, lack of learning resources, aids, and software geared to promote academic and social success.

87.     Further, as a result of the Defendants' noncompliance with the United States Supreme Court's holdings in *Endrew*, the Plaintiffs and Class Members are of information and belief, and therefore aver, they have suffered damages, including but not limited to, the lack of

ability to attain self-sufficiency and contribute to society that are substantially equal to the opportunities afforded to children without disabilities.

### III - Defendants are in Violation of the ADA

88.     The Plaintiffs and Class Members repeat and reallege each and every allegation contained above as if fully set forth herein.

89.     The Plaintiffs and Class Members are of information and belief, and therefore aver, that the Defendants are in violation of the ADA.

90.     Further, as a result of Defendants' noncompliance with the ADA, the Plaintiffs and Class Members are of information and belief, and therefore aver, that Defendants have failed to provide the Plaintiffs and Class Members the following services and opportunities, including, but not limited to: lack of necessary number of special needs staff; lack of funding; lack of facilities dedicated to promote academic and social success; and, lack of learning resources, aids, and software geared to promote academic and social success.

91.     As a result of the Defendants' noncompliance with the ADA, the Plaintiffs and Class Members are of information and belief, and therefore aver, they have suffered damages, including but not limited to, discrimination under the ADA in that students with disabilities have been excluded from participation in or denied the benefits of services, programs, or activities of a public school system for the very reason of being disabled.

### <u>CONCLUSION</u>

92.     It is well settled that the federal laws, federal regulations, state laws, state regulations, and state materials provide for FAPE, among other services, for students with disabilities in the State of Tennessee.

93. Currently, it is undisputed that the State of Tennessee has a severe shortage of special education staff to service the needs of students with disabilities.

94. Additionally, the Plaintiffs and Class Members would aver that the collective decisions of the United States Supreme Court discussed herein unmistakably require that an IEP must be uniquely crafted in order to provide a rigorous education for a student with special needs, and that there are penalties when school systems provide substandard services or provide false or incorrect summaries of the student's progress from year to year.

95. The Courts have consistently held that irreparable harm would be caused to a student if they wait for failure as opposed to taking corrective action in order to ensure they obtain FAPE.

96. The Plaintiffs and Class Members herein have waited long enough, thus, they filed this Class Action and request relief from this Honorable Court as more fully described below.

## **PRAYER FOR RELIEF**

WHEREFORE, PREMISES CONSIDERED, Plaintiffs and the Class Members demand a trial by jury and respectfully request that a judgment be entered against the Defendants as follows:

(1) That this Honorable Court determine that the instant action may be maintained as a Class Action under Rule 23 of the Federal Rules of Civil Procedure, and certify Plaintiffs as the Class Representative;

(2) That this Honorable Court issue an Order ruling that Plaintiffs are proper representatives of the Class Members, and appoint the undersigned as Class Counsel;

(3)     That this Honorable Court determine that each of the Plaintiffs' causes of actions may be properly maintained as a Class Action pursuant to Rule 23 of the Federal Rules of Civil Procedure;

(4)     That this Honorable Court issue an Order holding that Defendants are in violation of the IDEA, ADA, and relevant rulings of the United States Supreme Court;

(5)     That is Honorable Court issue an Injunctive and Declaratory Order holding that Defendants must comply with the provisions of the IDEA, ADA, and relevant rulings of the United States Supreme Court;

(6)     That this Honorable Court issue an Order awarding Plaintiffs and the Class Members compensatory damages in an amount to be proven at trial pursuant to *Perez v. Sturgis Pub. Sch.*, 2023 LEXIS 1291 (2023);

(7)     That this Honorable Court issue an Order awarding Plaintiffs and Class Members prejudgment and post judgment interest, as well as their reasonable attorney fees, expert fees, and other costs; and,

(8)     Such other, further and general relief that this Honorable Court deems equitable, just and proper.

Respectfully submitted this the 12th day of June, 2023.

**C.H., L.M., A.H., and other similarly situated Persons**

*Plaintiffs*

BY:     **/s/ Dail R. Cantrell**
        **/s/ W. Lucas Arnold**
        **/s/ R. Emily Horton**
        **/s/ Daniel R. Goodge**
        **DAIL R. CANTRELL #014780**
        **W. LUCAS ARNOLD #028044**
        **R. EMILY HORTON #038429**
        **DANIEL R. GOODGE #023647**

27

*Attorneys for Plaintiffs*
**THE CANTRELL LAW FIRM**
**P.O. Box 299**
**Clinton, TN 37717**
**Phone: 865-457-9100**
**Fax: 865-463-7881**
**dcantrell@cantrell-law.com**
**larnold@cantrell-law.com**
**ehorton@cantrell-law.com**
**dgoodge@cantrell-law.com**

**OF COUNSEL:**

**THE CANTRELL LAW FIRM**
**Post Office Box 299**
**Clinton, Tennessee 37717**
**(865) 457-9100**

28